# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| WESCO INSURANCE COMPANY,<br><br>Plaintiff/Counter-Defendant,<br><br>v.<br><br>ELEMENTS ARCHITECTURAL GROUP, INC.,<br><br>Defendant/Counter-Claimant. | No. 18 CV 2743<br><br>Judge Manish S. Shah |

## MEMORANDUM OPINION AND ORDER

There have been problems at the house that Elements Architectural Group designed for Stefen and Kristi Lippitz in Chicago. The Lippitzes say holes in the planter boxes caused water damage in the garage, flecks of metal were found lodged in the picture windows, and the hot tub on the top floor sprung a leak. They sent Elements three letters demanding money and repairs before initiating a lawsuit in state court. When Elements reported all of this to its insurance provider (Wesco Insurance), Wesco denied coverage, saying Elements had waited too long to tell them about it. Wesco then filed this declaratory action and, while it was pending, reached an agreement with the Lippitzes and Elements to settle their underlying dispute. Elements says that, during those settlement discussions (and again in open court), Wesco made admissions that resolve all of the issues presented here. Wesco and Elements have filed cross-motions for summary judgment, both seeking a declaration that the other should have to foot the bill for the defense of Elements in the state-

court suit. For the reasons discussed below, Wesco's motion is granted and Elements's is denied.

I.  **Legal Standards**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must show that, after "construing all facts, and drawing all reasonable inferences from those facts, in favor of the non-moving party," *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 668 (7th Cir. 2014), a "reasonable jury could not return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party is also entitled to summary judgment when the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). These same rules apply equally to cross-motions for summary judgment, *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017), and I may consider evidence from one motion when deciding the other. *Torry v. City of Chicago*, 932 F.3d 579, 584 (7th Cir. 2019). In deciding a motion for summary judgment that calls for the interpretation and application of a contract in a declaratory judgment action, when the terms of the contract are "clear and unambiguous," the contract should be construed and applied according to its literal

terms. *Elkhart Lake's Rd. Am., Inc. v. Chicago Historic Races, Ltd.*, 158 F.3d 970, 972 (7th Cir. 1998).

**II.     Facts**

Plaintiff and counter-defendant Wesco Insurance Company issued defendant and counter-claimant Elements Architectural Group Inc. two professional liability insurance policies. [42] ¶¶ 8, 9.[1] The first had a policy period spanning from November 6, 2015, to November 6, 2016. [42] ¶ 8. The second (a renewal of the first) spanned from November 6, 2016, to November 6, 2017. [42] ¶ 9.

According to both policies, Wesco agreed to indemnify Elements against claims that were made against it for damages "for wrongful acts arising out of the performance of professional services for others," and to defend Elements against all "covered claims." [42] ¶ 10. The policies define "claim" to mean "a demand received by [Elements] for money, damages, or professional services alleging a wrongful act arising out of the performance of professional services or contracting services." [42] ¶ 11. And the policies say that the insurance only applies to a "wrongful act" if the claim arising out of the wrongful act is "first made against [Elements] during the policy period" and reported in writing "no later than 60 days after the end of the policy period or, if applicable, during an extended claims reporting period." [42] ¶ 10. *See*

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. The facts are largely taken from Wesco's response to Elements's Local Rule 56.1 statement, [41], and Elements's response to Wesco's Local Rule 56.1 statement, [42], where both the asserted fact and the opposing party's response are set forth in one document.

3

*also* [42] ¶ 13 (Elements was also obligated to report any potential claims "as soon as practicable during the policy period").

The policies treat "[t]wo or more covered claims arising out of a single wrongful act or any series of related wrongful acts" as a single claim. [42] ¶ 12. If a claim was made—not reported, made—before the effective date of the second policy (i.e., before November 6, 2016, *see* [1-2] at 4–5), the second policy does not provide coverage for any claim made after the effective date that is "based upon the same or related wrongful acts." [42] ¶ 12.

The Lippitzes and Elements entered into a contract for Elements to provide professional architectural design services to design a house on West Stratford Court in Chicago. [41] ¶ 3; [42] ¶ 14. Elements designed the house and construction was completed in 2011. [42] ¶ 15. A few years later, when a leak developed in a planter that Elements had designed, the Lippitzes asked Elements and the general contractor to investigate. *See* [42] ¶ 16. Elements obliged, [46] ¶ 1,[2] but nonetheless, in July of 2016, the Lippitzes sent Elements a letter in which they claimed that the planter was defective and had caused water to collect under their deck and damage their garage. [42] ¶ 17. The Lippitzes considered Elements to be one of the liable parties (along with the construction firm), [42] ¶ 18, and sought $64,070 in damages. [42] ¶ 19. They characterized their letter as a "claim" against Elements and said that they planned to sue Elements if the requested payment was not received within fourteen days. [42] ¶ 19; [1-3] at 2. But at the end of that fourteen-day period, they did not file a lawsuit

---

[2] Elements filed an "Additional Statement of Uncontested Material Facts." [46].

(or follow up on their letter). *See* [42] ¶¶ 19–20; [46] ¶ 4. Elements did not report the July 2016 letter to Wesco before November 6, 2016 (the end of the first policy period). [42] ¶ 25.

In February of 2017, the Lippitzes sent a second letter, this time demanding arbitration and $92,000. [42] ¶¶ 21, 22; [1-5] at 1. Attached to that letter was a "statement of claim" that included descriptions of unsatisfactory picture windows (also designed by Elements, also mentioned in the July 2016 letter, *see* [1-3] at 2) and the water damage that had resulted from the planters. [1-5] at 3. The Lippitzes served a copy of the letter on Elements, [1-5] at 5–6, but never filed an official claim with the American Arbitration Association. [46] ¶ 5. Elements did not report the February 2017 demand to Wesco until August of 2017. *See* [42] ¶ 25.

In August of 2017, the Lippitzes circulated a second demand for arbitration, this time seeking $200,000 in damages. [42] ¶¶ 23–24. That demand attached an estimate from a restoration company that included costs associated with repairing both the garage and a hot tub located on the top level deck of the house. [1-6] at 36–40. Thirteen days after receiving the second arbitration demand, Elements made its first report to Wesco about the defective-design claims. [42] ¶ 25; [41] ¶ 11. Wesco denied tender of the claim, denied that it had a duty to defend Elements against the claim, and denied that it had a duty to indemnify Elements. *See* [41] ¶ 12. Instead, seven months after receiving notice of the claim, Wesco filed this lawsuit seeking a declaration as to its duties under the policies. *See* [42] ¶ 26. Shortly thereafter, the

Lippitzes filed an action for professional malpractice against Elements in Cook County. [42] ¶ 27.

Wesco, Elements, and the Lippitzes eventually attended mediation and reached an agreement in principle to resolve both the state-court lawsuit and any obligation Wesco had to "indemnify Elements in connection with the Lippitzes' claim." [42] ¶ 32. That agreement has still not been finalized. *See* [42] ¶ 33; [29] ¶¶ 2, 3. An unsigned document (titled, "confidential agreement and release") states that neither the release nor the consideration provided for therein "is intended to be or should be construed as an admission by any of the [parties to the agreement] of any obligation, fault, wrongdoing or liability whatsoever." [31-5] at 4, § VII.C. It also says that the purpose of the release is "to avoid the risks, burdens, and expenses attendant upon litigation, to cease certain adversarial relationships among [the parties to the agreement] and to settle and release the matters and claims." [31-5] at 1. It refers to both the state-court malpractice suit and this declaratory judgment case. *Id.* at 1, 2. The matters and claims covered include "any and all claims for coverage under the Wesco Policies arising out of" the lawsuit in state court. [31-5] at 2 § I.A. There is one exception: the agreement does not purport to settle "Elements' claim for defense costs incurred in the Underlying Action until its dismissal." *Id. See also* [41] ¶ 5 (Wesco has "agreed to compromise the portion of its declaratory judgment action … against Elements and the Lippitzes regarding Wesco's duty to indemnify").

A few weeks after that mediation, during a status hearing in this case, counsel for Wesco reported that the parties were "close to a settlement" of the state-court case

and that Wesco "believe[d]" that the parties had reached a "settlement in principle" that "should also dispose of this case." [39] at 2:13–17. Counsel for Elements said that the malpractice case against Elements had been resolved and that, as far as Elements was concerned, the resolution "satisfie[d] the indemnity issue on the coverage part of the case but leaves unaddressed the duty-to-defend issue." *Id*. at 3:3–7. Elements acknowledged that Wesco disagreed with that understanding. [39] at 3:4–6.

## III. Analysis

Elements is an Illinois Corporation with its principal place of business in Cook County, Illinois. [42] ¶ 2. Wesco is a Delaware corporation with its principal place of business in New York. [42] ¶ 1. The Lippitzes's demands exceeded $200,000 at the time this case was filed, *see* [42] ¶ 5, and evidence in the record substantiates those demands. *See, e.g.*, [1-6] at 37–40. I have jurisdiction under 28 U.S.C. § 1332(a). Wesco and Elements disagree over whether the former owes a duty to defend and indemnify Elements against certain claims submitted in relation to a set of insurance policies. *See* [1] ¶¶ 28–42, [16] at 16, 17, ¶¶ 20–22. That disagreement presents an actual controversy sufficient to permit me to resolve their dispute. *See* 28 U.S.C. § 2201.

Elements says that, without needing to decide whether the claims were covered under the policies, I should hold Wesco liable for defense costs because of statements Wesco made during attempts to settle the underlying state-court case which were tantamount to an admission that Wesco owed a duty to defend because they implicitly acknowledged that Wesco owed a duty to indemnify.

7

That argument fails for a few reasons. First, the strongest piece of evidence in favor of that argument (an unsigned, yet-to-be-finalized copy of a release of claims) is not admissible. *See* [31-5]; [42] ¶ 33. According to Federal Rule of Evidence 408,

> Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
>
> (1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and
>
> (2) conduct or a statement made during compromise negotiations about the claim—except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

Fed. R. Evid. 408. *See also In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1124 n.20 (7th Cir. 1979) (the rule "simply bars admission of evidence of compromise negotiations to prove liability or damages" and is "grounded on the policy of encouraging the settlement of disputed claims without litigation"). In deciding whether to exclude evidence under Rule 408, courts should consider "the spirit and purpose of the rule" and determine "whether the need for the settlement evidence outweighs the potentially chilling effect on future settlement negotiations." *Zurich Am. Ins. Co. v. Watts Indus., Inc.,* 417 F.3d 682, 689 (7th Cir. 2005) (collecting cases). "The balance is especially likely to tip in favor of admitting evidence when the settlement communications at issue arise out of a dispute distinct from the one for which the evidence is being offered." *Id.*

Rule 408 only bars the introduction of a statement if it is being introduced to prove the validity of the claim that was being settled when the statement was made. *See Wine & Canvas Dev., LLC v. Muylle*, 868 F.3d 534, 540 (7th Cir. 2017). For example, when a plaintiff implies during settlement negotiations that his lawsuit is only intended to harass, that statement is not barred if it is introduced in support of an abuse of process counterclaim that was filed as a result of those negotiations. *Id.* at 540–41. But a husband's letter attempting to resolve custody issues in state-court divorce proceedings is barred if the wife later seeks to introduce that letter as evidence in the husband's federal lawsuit to have the children returned to a different country under the Hague convention. *Walker v. Walker,* 701 F.3d 1110, 1115–17 (7th Cir. 2012). In the former situation, there was "no possibility that the settlement discussion" addressed the claim it was introduced to prove, *Wine & Canvas,* 868 F.3d at 541, whereas in the latter, the proceedings were not "entirely separate" because a "decision or action in one proceeding almost inevitably [would] have an impact on the other." *Walker*, 701 F.3d at 1117.

Since Elements and Wesco both participated in the negotiations, and since the release explicitly acknowledges that its purpose was in part the settlement of "claims for coverage under the Wesco Policies arising out of the Underlying Action," [35-1] at 2 § I.A, a straightforward application of Rule 408 would suggest that Elements cannot now introduce the release in order to prove that the malpractice claim was covered by the policies. But Elements says that because the release explicitly declines to settle the issue of defense costs, *id.*, Rule 408 does not bar Elements from introducing the

9

release as proof of the validity of its argument with regard to that issue. *See* [49] at 4. And, Elements says, since the duty to defend can be proven by showing that a duty to indemnify existed, *see* [31] at 8 (citing *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 127 (1992)), Elements should be allowed to introduce the release to show that Wesco owed it a duty to indemnify because, if true, that would mean Wesco owed Elements a duty to defend, too. *See* [49] at 4.

The duties to defend and indemnify "are not necessarily mutually dependent or coextensive." *Keystone Consol. Indus., Inc. v. Employers Ins. Co. of Wausau*, 456 F.3d 758, 762 (7th Cir. 2006). *See also Sokol & Co. v. Atl. Mut. Ins. Co.*, 430 F.3d 417, 421 (7th Cir. 2005) ("The two duties of the insurer—defense and indemnification—are distinct; while the duty to indemnify may sometimes nest inside the duty to defend, that will not always be the case."). But in this case, they are dependent. The policies say that Wesco only had the duty to defend Elements against "covered" claims, [42] ¶ 10; [1-1] at 6, and Wesco was obligated to indemnify Elements for its legal obligations to pay for "wrongful acts arising out of the performance of professional services for others." [42] ¶ 10; [1-1] at 5. If Wesco was obligated to indemnify Elements against a claim, the claim was "covered," and Wesco also had a duty to defend. [42]¶ 10.

For that reason, Wesco's statements that it intends to pay to settle the malpractice case and the declaratory judgment claim for indemnity are inadmissible. First, there is no dispute that the statements were made, at least in part, to compromise the disputed claim of indemnification. Next, Elements is offering the

10

statements to prove that Wesco owes the duty to indemnify—a disputed issue in this lawsuit. *See* [1] ¶¶ 28–42. The theory is that by proving the duty to indemnify, Elements necessarily proves the duty to defend; but the duty to indemnify is a disputed claim that Elements is seeking to prove through settlement admissions. That is reason enough to trigger Rule 408, but to be clear, it applies here to the effort to use the settlement to prove the duty to defend. A statement admitting that Wesco owed a duty to indemnify would "almost invariably … have an impact on" the issue of whether it also owed a duty to defend, *Walker,* 701 F.3d at 1115; it would completely dispose of the issue. Under these policies, a statement admitting a duty to indemnify is a statement about both the duty to indemnify and about the duty to defend, both of which are disputed in this lawsuit. Rule 408 bars that statement's introduction.

This result is also in line with the goals that motivate Rule 408. Permitting the introduction of statements in such a situation would chill future attempts to settle duty-to-indemnify claims while leaving unresolved duty-to-defend claims because statements made during those negotiations could later be introduced to prove liability on any duty-to-defend claims. *See Zurich Am. Ins. Co.,* 417 F.3d at 689; Fed. R. Evid. 408 Advisory Committee Notes (one of the purposes of Rule 408 is to promote "the public policy favoring the compromise and settlement of disputes"). It would delay resolution of underlying actions (like the malpractice case here) if insurance companies feared that they could not compromise without admitting a duty to defend.

11

The release cannot be introduced to prove Wesco's intent, either. [49] at 5. Rule 408 does not bar the introduction of a statement for purposes other than proving the validity (or amount) of a claim, but Elements offers no reason Wesco's intent would be relevant other than to prove the validity of the claim. *See, e.g.,* [49] at 5–6 ("The intent of Wesco was that it agreed to pay Lippitz $75,000 because it owed Elements the duty to indemnify Elements for the Lippitz claim"). Rule 408 precludes considering the release for that purpose. *See* Fed. R. Evid. 408; *Walker,* 701 F.3d at 1115.

Elements says that Rule 408 does not bar the release to prove the "fact of settlement," but in the cases it cites the fact of settlement was relevant because someone had argued that the settlement agreement had been breached. *See Cates v. Morgan Portable Bldg. Corp.*, 780 F.2d 683, 686–87 (7th Cir. 1985) (settlement agreement properly introduced to prove reasonable reliance on the agreement and that the agreement had been breached); *Coakley & Williams Const., Inc. v. Structural Concrete Equip., Inc.*, 973 F.2d 349, 353–54 (4th Cir. 1992) (a settlement offer may be introduced as extrinsic evidence of a party's intent when the finalized settlement agreement is ambiguous and when one party argues that the filing of the suit was itself a breach of the underlying settlement agreement). No one is arguing that Wesco breached the release. Wesco never even signed the release and the parties agree that the release has not been finalized. [42] ¶ 33; [31-5] at 5.

Rule 408 bars the introduction of the release. But even if I were to consider it, no reasonable juror could agree with Elements's interpretation of it. That

12

interpretation is squarely and repeatedly contradicted by the language of the release itself. The release says that the parties did not intend for it to be construed as an admission of "any fault … or liability whatsoever," and says the duty-to-defend issue is not resolved by the settlement. [31-5] at 4 (§ VII.C), 2 (§ I.A). Wesco has not yet signed the release, [29] ¶¶ 2, 3; [42] ¶ 33; [31-5] at 5, so Elements would be asking a jury to infer from the unsigned release that Wesco affirmatively admitted liability for a claim the release explicitly leaves unresolved, in the face of affirmative disclaimers to the contrary. No reasonable juror would make that inference.

The statements from the March 1 status hearing are not admissions either. *See* [39]. Even assuming that it is proper to take judicial notice of a statement made during a status hearing, *see Triple H Debris Removal, Inc. v. Companion Prop. & Cas. Ins. Co.,* 647 F.3d 780, 785 (8th Cir. 2011) ("a court can take judicial notice of a statement made during oral arguments or in court"), and even if such statements constitute binding admissions, Wesco never admitted to owing a duty to indemnify during the status hearing. All Wesco represented was that it "believe[d]" that the parties had reached a "settlement in principle" that "should also dispose of this case." [39] at 2:13–17. It was counsel for Elements—not Wesco—that said the resolution "satisfie[d] the indemnity issue on the coverage part of the case," and in the same breath, counsel for Elements acknowledged that Wesco disagreed with that interpretation. *Id*. at 3:3–7. And even if Wesco had made that statement, it would only have been an admission that the parties had settled their dispute and agreed to move on—not that Wesco was liable. No reasonable juror could conclude from that

13

transcript that Wesco admitted to owing Elements a duty to indemnify or a duty to defend.

Elements points to nothing else in the record that supports its argument that Wesco admitted to owing a duty to indemnify or a duty to defend. A few of its other arguments fail as a result. Elements's argument that it reasonably relied on Wesco's statements and that Wesco should be estopped from arguing that it did not owe a duty to defend, *see* [44] at 3, fails because no juror could find that it was reasonable to believe Wesco had admitted to owing a duty to indemnify. Nor has Wesco waived the right to assert that it did not have a duty to defend. In order to waive that right, Wesco had to take an affirmative, consensual act that amounted to an "intentional relinquishment." *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill.2d 384, 396 (1993). No facts suggest waiver. The release explicitly stated that the duty-to-defend claim was not being settled, [31-5] at 2 (§ I.A), and by the time the settlement had been reached in principle, Wesco had already filed a lawsuit seeking to determine whether it owed the duty to defend. [42] ¶ 32; [1]. There was no waiver.[3]

---

[3] Elements also says that it has not assigned any rights to Wesco, [49] at 3, but Wesco is not seeking to enforce any rights that originally belonged to Elements. In addition, Elements says that Wesco cannot object to the fact that the state-court case was settled because it does not have standing to do so. [49] at 3. It does not elaborate, nor cite any authority in support. "[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *United States v. Cisneros,* 846 F.3d 972, 978 (7th Cir. 2017). And lastly, Elements says that evidence of the underlying settlement can be admitted to prove bad faith. [49] at 6. In support of that assertion, Elements cites "Athey," by which Elements might have meant *Athey v. Farmers Ins. Exch.,* 234 F.3d 357, 362 (8th Cir. 2000), in which the Eighth Circuit held that, under South Dakota law, "an insurer's attempt to condition the settlement of a breach of contract claim on the release of a bad faith claim may be used as evidence of bad faith." But Elements has not brought a claim for bad faith, nor otherwise argued that the release is evidence of bad faith. Each of these arguments is unavailing.

14

The coverage issue must be resolved in Wesco's favor. The policies state that the insurance only applied to a wrongful act if Elements reported the claim to Wesco within 60 days of the end of the policy period. [42] ¶ 10. Elements admits that the Lippitzes wrote it a letter in July of 2016 in which they demanded that Elements pay for damages caused by allegedly defective planters that Elements designed. [42] ¶ 17–21. Elements says that it would have reported the claim if the Lippitzes had filed a lawsuit. [44] at 4. But the letter was a claim under the policies: claims were defined to include any demand for money (any at all) alleging a wrongful act arising out of the performance of either professional services or contracting services, whether or not those demands came in the form of a lawsuit. [42] ¶ 11. The July 2016 letter met those requirements. It threatened litigation if Elements did not pay money within fourteen days. *See* [42] ¶ 17–20; [1-3] at 2. Elements admits that it did not report the July 2016 letter (or any of the facts contained therein) to Wesco until August of 2017, [42] ¶ 25, more than nine months after the end of the policy period of the policy that was in effect at the time the letter was received. [42] ¶ 8; [1-1] at 2. Nor does Elements argue that any "extended claims reporting period" applied to the claim. *See* [42] ¶ 10.

There is nothing improper or unenforceable about the policies. *See, e.g., Cont'l Cas. Co. v. Coregis Ins. Co.*, 316 Ill.App.3d 1052, 1062 (1st Dist. 2000), *opinion modified on denial of reh'g* (Nov. 15, 2000) ("It is well established that the 'claims made' or 'discovery' policy is characterized by coverage for negligent acts or omissions only if such are discovered during and brought to the attention of the insurer within the policy term"). Such policies are enforced "according to the clear and precise terms

15

the parties contracted for." *Graman v. Cont'l Cas. Co.*, 87 Ill.App.3d 896, 900 (5th Dist. 1980). *See also James River Ins. Co. v. Kemper Cas. Ins. Co.*, 585 F.3d 382, 383 (7th Cir. 2009) (claims-made policies "insure against liability based on legal claims against the insured filed during the period covered by the policy … provided those claims are based on acts committed after the policy's 'retroactive date.'").

The Lippitzes did not abandon their claim. Elements seeks an inference of abandonment from the failure to file a lawsuit within the threatened time. Elements makes a similar argument with regard to the February 2017 arbitration demand, which it says the Lippitzes abandoned or withdrew when they failed to file the demand with the American Arbitration Association. There are two problems with these arguments.

First, the policies required Elements to report any claims to Wesco "as soon as practicable during the policy period." [42] ¶ 13. Such conditions are "interpreted to mean 'within a reasonable time,'" *Country Mut. Ins. Co. v. Livorsi Marine, Inc.*, 222 Ill.2d 303, 311 (2006), and it was reasonable to expect that Elements would have reported the initial claim within two weeks (the window given by the letter). It was certainly practicable—Elements managed to report the second arbitration demand it received on August 17, 2017, within two weeks. *See* [42] ¶¶ 23, 25. Elements advances no argument, nor points to any evidence in the record, suggesting there was some reason it could not have reported the claims sooner. No reasonable juror could come to any other conclusion.

Second, the failure to file a lawsuit and the failure to lodge a demand for arbitration with the American Arbitration Association did not amount to a withdrawal or abandonment of the malpractice claim. The policies define a "claim" to mean a "demand received." [42] ¶ 11. They contain no exception for demands that are withdrawn or demands that grow stale, whether by their own terms or not. *See* [42] ¶¶ 10–12; [1-1]; [1-2]. The letter says that the Lippitzes believed that Elements was liable for roughly $64,000 and that litigation would be instituted if payment was not received within fourteen days. [1-4] at 4. It contains no statement that, by not filing litigation, the Lippitzes intended to indicate that they no longer believed Elements was liable.[4]

Elements also says that the claim that it reported in August of 2017 was timely because it concerned a different claim than the one raised in the July 2016 letter: a leak underneath the third-story hot tub. [44] at 6. As evidence that the August 2017 claim was different, Elements points out that the amount requested jumped from $62,000 (as was demanded in the July 2016 letter) to $200,000. [44] at 6. But both demands flow from the same, singular wrongful act: Elements's failure to provide acceptable professional architectural design services for the design of the home. [41] ¶ 3; [42] ¶¶ 14, 15. A single contract governed the provision of those design services. *See* [42] ¶ 14; [31-4] at 17–23. That contract contemplates the design of both a "new

---

[4] The first arbitration demand (sent in February of 2017) does not say that the claim would be filed with the American Arbitration Association by any specific deadline, meaning that the failure to file a claim with the American Arbitration Association was even less an indication of an intent to withdraw than the failure to file a lawsuit. [1-5]. Regardless, by February of 2017, Elements had already missed the deadline to report the July 2016 letter.

garage space" and a "new outdoor space on the roof of the home." [31-4] at 17. Nothing in the record indicates that the design of the hot tub occurred as part of a different transaction or act than that which resulted in the design of the planters that were at the heart of the claim made in July of 2016.

Both policies say that "two or more covered claims arising out of a single wrongful act, or any series of related wrongful acts, will be considered a single claim." [42] ¶ 12. And both policies (but importantly, the second one) say "[i]f the first of such claims is made prior to the effective date of this policy, no coverage shall apply to any subsequent claims made during this policy period which are based upon the same or related wrongful acts." *Id.* The July 2016 letter and the August 2017 demand were both based on the design of the Lippitz family's home. At the very least, the two acts were related in that they were both contemplated by the contract that the Lippitzes entered into with Elements.

Elements does not argue that the policies should not be enforced or that any rule relaxes the deadline for reporting the claims to Wesco. At most, Elements implies that what Wesco characterizes as a failure to report a claim is actually a declination to defend under a policy exclusion. [44] at 6–7. But neither of the cases Elements cites support an argument that declining coverage because of a failure to notify an insurer of a claim under a claims-made policy is the equivalent of denying coverage under an exclusion. *See Country Mut. Ins. Co. v. Livorsi Marine, Inc.*, 222 Ill.2d 303, 312 (2006); *Safeway Ins. Co. v. Ebijimi*, 2018 IL App (1st) 170862, ¶ 56. In any event, the distinction does not matter. Although "ambiguous or equivocal expressions in an

18

insurance policy that operate to limit the insurer's liability will be construed strongly against the insurer and liberally in favor of the insured," *Herrera v. Benefit Tr. Life Ins. Co.*, 126 Ill.App.3d 355, 359 (1st Dist. 1984), there is no ambiguity here. The July 2016 letter had to be reported within 60 days of the end of the policy period, and was not. [42] ¶¶ 10–12.

Other than its argument that Wesco conceded indemnification, Elements advances no argument (and has produced no facts) to support its assertion that Wesco was obligated to defend it. The counterclaim suggests that Elements believes the duty to defend would not have ceased until the underlying claim was settled, *see* [16] ¶¶ 19–22, but at the latest, Wesco's duty to defend was suspended once it filed this declaratory action in April of 2018. *See Certain Underwriters at Lloyd's v. Prof'l Underwriters Agency, Inc.*, 364 Ill.App.3d 975, 979 (2nd Dist. 2006). For the seven-month intervening period, Elements asserts that it was owed a duty to defend. But for the reasons discussed above, Elements failed to give timely notice so the malpractice claim was not covered under the applicable insurance policies.

Elements implies that because Wesco did not immediately file a declaratory action, Wesco should be estopped from arguing that the claim was not covered under the policies. *See* [44] at 3 (citing *Employers Ins. of Wausau v. Ehlco Liquidating Tr.*, 186 Ill.2d 127, 130 (1999)). In *Employers Ins. of Wasau*, the Illinois Supreme Court held that, in the event that an insurer fails to either defend the suit under a reservation of rights or seek a declaratory judgment that there is no coverage and "is

later found to have wrongfully denied coverage, the insurer is estopped from raising policy defenses to coverage." *Employers Ins. of Wausau,* 186 Ill.2d at 130 (1999).

Elements has failed to show that Wesco wrongfully denied coverage. Even though the duty to defend is generally broader than the duty to indemnify, the insurer may still refuse to defend the suit (and refuse to file a declaratory judgment action) if it is clear from the face of the underlying claim that the claim is not within the policy's coverage. *Id.* at 153 (citing *U.S. Fid. & Guar. Co. v. Wilkin Insulation Co.,* 144 Ill.2d 64, 73 (1991)). Such was the case here: the August 2017 claim clearly arose from the same (or at least, a related) act as that from which the July 2016 letter arose.

## IV. Conclusion

Wesco's motion for summary judgment, [35], is granted. Elements's motion for summary judgment, [31], is denied. Wesco is under no duty to defend Elements in connection with the malpractice claims. Judgment will be entered in Wesco's favor on the claim and counterclaim as to the duty to defend, after the parties file a stipulation of dismissal of the claims related to the duty to indemnify (pursuant to their settlement agreement). The stipulation of dismissal should be filed by November 12, 2019.

ENTER:

Manish S. Shah
United States District Judge

Date: November 5, 2019